## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Global Generation Group, LLC;
and Benchmark Capital, LLC,

               Plaintiffs,

v.

Frank Mazzola; Emilio
DiSanluciano; FB Management
Associates II, LLC; Pipio
Management Associates, LLC;
Felix Venture Partners Qwiki
Management Associates, LLC;
Facie Libre Management
Associates, LLC; FMOF
Management Associates, LLC,

               Defendants.

Case No. 13-cv-14979
Hon. Judith E. Levy
Mag. Judge Michael J. Hluchaniuk

_____/

## OPINION AND ORDER GRANTING DEFENDANTS'
## MOTION TO COMPEL ARBITRATION [14]

This is a case involving several claims arising from a stock-

purchasing agreement between plaintiffs and defendants.  Pending is

defendants' motion to compel arbitration or dismiss the complaint.  For

1

the reasons set forth below, the defendant's motion to compel arbitration is granted and the complaint is dismissed.[1]

## I.      Background

Defendants are individuals and corporate entities whose business involved the solicitation of other parties to invest in what were termed "Opportunity Funds": subsidiary companies set up for the sole purpose of holding highly desirable stock in privately held tech companies. Defendants offered memberships in the Opportunity Funds to third parties.  Each Opportunity Fund issued various Series; each Series purported to consist of a certain number of shares of stock in a given company, with those shares in turn being held by another company. Purchasing a membership in an Opportunity Fund consisted of subscribing to some portion of a Series, which made the member the effective owner of the number of shares correlating to their membership interest in a Series.

---

[1] Plaintiffs have also filed a motion for partial summary judgment as to two counts. (Dkt. 26.)  As arbitration is being compelled as to all of plaintiffs' claims, the Court denies the motion for partial summary judgment as moot.

2

Membership in each fund, as well as the nature, responsibilities, and management of each fund are laid out in the fund's Operating Agreement.

### A. The Felix Multi-Opportunity Fund II, LLC ("FMOF II")

The relevant fund in this matter is FMOF II, which is governed by the FMOF II Operating Agreement. The agreement defines the roles and responsibilities of FMOF II, its members and its managers, among other things. The FMOF II Operating Agreement contains a broad arbitration provision requiring that, "[i]n the event of any claim, dispute or controversy arising under, out of or relating to this Agreement or any breach or purported breach thereof," the parties first attempt to resolve any such dispute during a 90-day settlement period, and then, should that fail, submit the dispute to binding arbitration administered by the American Arbitration Association. (Dkt. 14-2, §§ 14.1 – 14.3.)

The FMOF II Operating Agreement also incorporates any subscription agreement and any "Side Letters" between a member and FMOF II. (Id., § 15.3.) A Side Letter is "any written agreement . . . entered into by [FMOF II] with one or more Members[.]" (Id., Art. I.) A

3

Side Letter "may modify the terms of [the FMOF II Operating Agreement] with respect to the Members party thereto."  (Id., § 15.3.)

## B. The Facebook and Palantir Transactions

In 2011, defendants solicited plaintiffs to purchase a membership interest in FMOF II.  Between August and October 2011, the parties entered into the following transactions:

1) **August 11, 2011**: Plaintiff Global Generation Group, LLC ("Global") paid $800,000 for a 100% membership interest in Series F-9.2.11(B) of FMOF II.  FMOF II purported to own an interest in Facie Libre Associates II, LLC ("FLA II") representing the equivalent of 22,857 underlying shares of Class B Common Stock in Facebook, Inc. ("Facebook").  Global executed a subscription agreement with defendants Mazzola and DiSanluciano, representing defendant FMOF Management, commemorating the transaction on or around October 4, 2011.

2) **September 2, 2011**: Global paid $1,204,990.88 for a 78.4149% membership interest in in Series F.9.2.11(A) of FMOF II. Plaintiff Benchmark Associates, LLC ("Benchmark") paid

$331,695.66 for the remaining 21.59% membership interest in the same Series.  FMOF II purported to own an interest in FLA II representing the equivalent of 48,021 total underlying shares of Class B Common Stock in Facebook for both transactions. Plaintiffs and defendants Mazzola and DiSanluciano, representing defendant FMOF Management, executed subscription agreements commemorating each transaction on or around October 4, 2011.

3) **October 24, 2011**: Global paid $1,218,750.88 for a 100% membership interest in Series F-10.5 of FMOF II.  FMOF II purported to own an interest in FLA II representing the equivalent of 37,500 shares of Class B Common Stock in Facebook.  Global executed a subscription agreement with defendants Mazzola and DiSanluciano, representing defendant FMOF Management, commemorating the transaction on or around October 24, 2011.

4) **October 6, 24 and 31, 2011**: In three transactions, Global paid a total of $2,800,000 for a 100% membership interest in Series E-2(B) of FMOF II.  FMOF II purported to own 933,333 shares

of Class A Common Stock in Palantir Technologies, Inc. ("Palantir").  Global executed a subscription agreement with defendants Mazzola and DiSanluciano, representing defendant FMOF Management, commemorating the transaction on or around December 12, 2011.

Global paid a total of $6,023,741.76 for its shares in Facebook and Palantir; Benchmark paid a total of $331,695.66 for its shares in Facebook.

## C. The December 7, 2011 Letter and Guarantee

On December 7, 2011, defendants sent plaintiffs' representative, John Syron, a letter memorializing certain terms of their transactions ("the Letter").  The Letter, among other things: 1) modified Section 4.7.1 of the FMOF II Operating Agreement relating to distributions; 2) granted plaintiffs' Put Rights in exchange for paying the Manager of the Fund an additional five percent of the distribution owed the manager under the revised Section 4.7 of the FMOF II Operating Agreement; and 3) stated that the modification in the Letter "supersedes any actual or potentially conflicting wording in the FMOF OA[.]"  (Dkt. 1-2, at 7.)  All defendants signed the letter, as did Syron, on behalf of plaintiffs.

6

Plaintiffs' Put Rights permitted them, at any time following the one-year anniversary of their purchase of the membership interest in any Series, to deliver written notice of intent to demand redemption from the Manager of the Fund. Redemption was defined as the amount of money the member initially paid to FMOF II for the security. (Dkt. 1-2, at 5.) The parties would then agree on a redemption date no more than forty-five days after the notice was given, and the Manager would pay the member the redemption amount on that date. (Id.)

In order to induce plaintiffs to sign the Letter, defendants also executed a Guarantee pursuant to the Letter.[2] In sum, the Guarantee promised that the defendants, named as "Affiliates," would guarantee payment of any money owed on exercise of the Put Rights. The Guarantee also stated that, pursuant to the corporate defendants' respective Operating Agreements (the FMOF II Operating Agreement among them), each corporate defendant would offer certain Back-End Fees equal to 150% of the aggregate amount of each the member's capital contributions in FMOF II, less amounts funded in escrow, as collateral for the Put Rights. (Dkt. 1-3, at 5.)

---

[2] The Guarantee terms the Letter a "Side Letter." (Dkt. 1-3, at 2.)

The Guarantee states that it, "together with the Side Letter, constitutes the final and entire agreement with respect to the subject matter contained herein." (Id., at 7.) It was executed on December 7, 2011, by all the parties to this suit.

### D. The Dispute

Plaintiffs attempted to exercise their Put Rights for the Facebook shares on August 14, 2012, and submitted written notice demanding redemption for the entire amount paid to FMOF II for the shares. Pursuant to the Letter, the Manager of FMOF II was required to pay the redemption amount within 45 days, or by October 28, 2012. Plaintiffs allege that defendants instead retained the shares until May 9, 2013, when defendants sold the shares without paying plaintiffs.

Global also attempted to exercise its Put Rights for the Palantir shares on October 9, 2012. Global alleges that defendants likewise failed to pay it and instead sold the shares at some later date.

Plaintiffs filed this suit on December 9, 2013, alleging securities fraud, breach of contract of the Letter and Guarantee, common-law fraud, and innocent misrepresentation, unjust enrichment, and unlawful conversion under Michigan law.

8

## II.    Legal Standard

"A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  Federal Arbitration Act, 9 U.S.C. § 2.

"A party aggrieved by the alleged ... refusal of another to arbitrate under a written agreement for arbitration may petition ... for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  "The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."  *Id.*

In considering a motion to compel arbitration, the Court must determine: 1) whether the parties agreed to arbitrate; 2) the scope of the agreement to arbitrate; 3) if federal statutory claims are asserted, whether Congress intended the claims to be arbitrable; and 4) if some, but not all of the claims are subject to arbitration, whether to stay the

9

remainder of the proceedings pending arbitration. *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 392 (6th Cir. 2003).

The Court examines "arbitration language in a contract in light of the strong federal policy in favor of arbitration, resolving any doubts as to the parties' intentions in favor of arbitration." *Nestle Waters N. Am., Inc. v. Bollman*, 505 F.3d 498, 503 (6th Cir. 2007).   "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25 (1983)).

"[I]n the absence of any express provision excluding a particular grievance from arbitration . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986). "[A]ny doubts are to be resolved in favor of arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Nestle*, 505 F.3d at 504.

## III.  Analysis

Defendants argue that all of plaintiffs' claims are subject to the arbitration clause in the FMOF II Operating Agreement, which deprives the Court of jurisdiction over the dispute.  In support of this argument, defendants provide two documents not included with plaintiffs' complaint: the FMOF II Operating Agreement and signature pages purportedly from the Subscription Agreements signed by plaintiffs.

Plaintiffs, in turn, argue that they never signed any document containing any reference to arbitration and that their claims rest only on the Letter and the Guarantee.  Plaintiffs read Letter and Guarantee as documents that are wholly independent of the FMOF II Operating Agreement.  Because the documents neither refer to nor require reference to the FMOF II Operating Agreement in order to be enforced, they argue, the claims cannot and should not be arbitrated.

They further argue that the Agreement is not enforceable against the defendants who are not signatories to the Operating Agreement (Mazzola, DiSanluciano, FB Management Associates II, LLC, Pipio

11

Management Associates, LLC, and Felix Venture Partners Qwiki
Management Associates, LLC).

### A. The Relation of the FMOF II Operating Agreement, Letter, and Guarantee

The first and most critical part of this inquiry is how, exactly, each
of the relevant documents relate to each other.

The only documents included with plaintiffs' complaint were the
Letter and Guarantee.  Although a court may not normally look at
documents outside the complaint on a motion to dismiss, it may
consider documents either referenced in the plaintiffs' complaint or
central to a plaintiff's claims in a motion to dismiss.  *Tellabs, Inc. v.
Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also
Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999).

The FMOF II Operating Agreement is mentioned throughout the
Letter and Guarantee in plaintiffs' complaint, and the Court will
consider it.  Although the Subscription Agreements provided with
defendants' response to plaintiffs' opposition to the instant motion are
referenced repeatedly in plaintiffs' exhibits, the signature pages
provided by defendants, on their own, are insufficiently trustworthy to
consider at this stage.  Each is the ninth page of a document provided

12

without the body of the governing document; the Court cannot determine from the segregated pages the content of each Subscription Agreement and what, if anything, the parties actually agreed to. As such, the Court will not consider the Subscription Agreement signature pages in its determination as to whether these claims are arbitrable.

The odd and labyrinthine relationship between defendants extends to the agreements memorializing their relationship with their clients. Different terms are used at different times to refer to the same operative documents; the Letter containing the Put Rights is signed on behalf of three LLCs by the same person, while the Guarantee requires two individuals and five separate LLCs to take effect; and defendants sell interests in one company's stock held by a second company that can only be purchased through a third company.

The simplest starting point is the one generating the substantive rights plaintiffs wish to enforce: the Letter. The Letter is, by its plain terms, a modification of the FMOF II Operating Agreement. Paragraph 4 of Section I expressly modifies Section 4.7.1 of the FMOF II Operating Agreement, and the rest of the letter lays out the rights the Manager and Purchaser/Member have under the modified Operating Agreement.

The Letter, furthermore, ends by stating that it supersedes any actual or potentially conflicting wording in the FMOF II Operating Agreement by virtue of that modification.

The Guarantee not only bolsters this interpretation; when read in conjunction with the FMOF II Operating Agreement, it confirms it. It is undisputed that the Guarantee was issued in conjunction with the Letter, which it refers to, importantly, as "that certain Side Letter." The FMOF II Operating Agreement not only defines what a Side Letter is, but *expressly incorporates* any Side Letter into the Agreement in its Section 15.3. Accordingly, the Letter is a Side Letter modifying the FMOF II Operating Agreement.

The Guarantee, in turn, provides various assurances related to the modifications set forth in the Side Letter designed to induce plaintiffs to purchase memberships in FMOF II.

**B. The Arbitration Provision Is Binding on Plaintiffs**

The question left for the Court is the effect the FMOF II Operating Agreement's arbitration provisions have on plaintiffs' claims. Defendants argue that the FMOF II Operating Agreement is an umbrella agreement, while plaintiffs argue that the Letter and

14

Guarantee are entirely separate agreements having nothing to do with the FMOF II Operating Agreement. Both parties are incorrect.

In *Nestle Waters*, the Sixth Circuit held that an arbitration clause in one agreement was enforceable with regard to later agreements where the first agreement was an "umbrella agreement governing the parties' overall relationship[.]" *Nestle Waters,* 505 F.3d at 506. There, a Purchase and Sale Agreement for certain property rights on 868 acres of land contained an arbitration clause. Pursuant to that agreement, the parties subsequently entered into several other agreements to ensure the rights were properly transferred to the buyer. None of the subsequent agreements contained the same arbitration language; many contained none whatsoever. *Id*. at 500-01. The subsequent agreements were entirely separate legal documents, but the sole reason for their existence was the umbrella agreement, which contained an arbitration clause governing the other agreements entered into pursuant to its ultimate goals. *Id*. at 506.

The Court need not engage in a *Nestle Waters* analysis here, as the FMOF II Operating Agreement is not an umbrella agreement. The two other agreements here are not separate and distinct legal

15

agreements designed to further the goals of a governing agreement. The Letter and the Guarantee are, together, a modification of the Operating Agreement, having effect only if integrated into the Operating Agreement.

As set forth above, the Court must resolve all doubts in favor of arbitration. The Letter expressly modifies the FMOF II Operating Agreement, which in turn expressly incorporates the Letter into the overall agreement; the Guarantee provides assurances for the promises of the Letter incorporated into the Operating Agreement. Whatever doubts the Court has about the applicability of the arbitration provision, it must enforce the provision where the agreements inescapably lead to an agreed-upon and enforceable arbitration clause.[3]

---

[3] Plaintiffs also argue that the "Entire Agreement" clause in Paragraph 11 of the Guarantee demonstrates that the Letter and Guarantee are a separate agreement entirely distinct from the FMOF II Operating Agreement. The clause states that "[The Guarantee], together with the Side Letter, constitutes the final and entire agreement with respect to the subject matter contained herein." (Dkt. 1-3, at 7.) This language refers only to the fact that the Letter and Guarantee are the entire agreement with respect to the modification and consideration for the modification of the FMOF II Operating Agreement.

16

Accordingly, Section 14 of the FMOF II Operating Agreement requiring arbitration is binding as to the plaintiffs and the signatory defendants, and compels arbitration between them.

### C. All of Plaintiffs' Claims Are Arbitrable

The arbitration clause in the FMOF II Operating Agreement is broad, covering "any claim, dispute or controversy arising under, out of or relating to [the] Agreement." All of plaintiffs' claims inherently relate to the modified FMOF II Operating Agreement to which they were a signatory. Plaintiffs' attempt to avoid the arbitration clause by not suing FMOF II directly does not change this analysis.

The federal statutory claim under Section 10(b)(5) of the Securities Exchange Act is likewise subject to arbitration. *See, e.g., Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 237-38 (1987) (holding that 10(b) claims may be arbitrated under the Federal Arbitration Act).

### D. The Nonsignatories to the Operating Agreement Are Bound to Arbitrate by Equitable Estoppel

Defendants Mazzola, DiSanluciano, FB Management Associates II, LLC, Pipio Management Associates, LLC, and Felix Venture Partners Qwiki Management Associates, LLC are all signatories to the

Guarantee, but not to the Operating Agreement or Letter. All have stipulated to arbitration in lieu of litigation both in briefing and during oral argument. In order to avoid any potential dispute should a non-signatory party determine it no longer wishes to acquiesce to arbitration, the Court will require arbitration among all parties under a theory of equitable estoppel. *See, e.g., Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 629 (6th Cir. 2003) (courts may bind nonsignatories to arbitration agreements under a theory of equitable estoppel).

Although the above-referenced parties are not signatories to either the Letter or Operating Agreement, they are signatories to the Guarantee used to induce plaintiffs to become signatories to both of those documents. Given the strong federal policy favoring arbitration, it would be inequitable to let a nonsignatory wash its hands of the arbitral process it induced another party to sign on to.

The Court accordingly compels all defendants to arbitrate all of plaintiffs' claims pursuant to Section 14 of the FMOF II Operating Agreement.

## IV.   Conclusion

For the reasons set forth above, the Court will enforce the arbitration clause contained in Section 14 of the FMOF II Operating Agreement as to all claims.  Accordingly,

Defendants' motion to compel arbitration is GRANTED;

Plaintiffs' motion for partial summary judgment is DENIED AS MOOT; and

Plaintiffs' complaint is DISMISSED.

IT IS SO ORDERED.


Dated: June 26, 2014                    s/Judith E. Levy
      Ann Arbor, Michigan            Hon. JUDITH E. LEVY
                                United States District Judge


## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 26, 2014.


                                s/Felicia M. Moses
                                FELICIA M. MOSES
                                Case Manager